UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KCK INDUSTRIAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:19-CV-05173 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MCM MANAGEMENT CORP., JENKINS | ) | |
| ENVIRONMENTAL, INC., MARINE | ) | |
| TECHNOLOGY SOLUTIONS LLC, METAL | ) | |
| MANAGEMENT MIDWEST, INC. d/b/a | ) | |
| SIMS METAL MANAGEMENT, FERROUS | ) | |
| PROCESSING AND TRADING CO., | ) | |
| ROBERT MARDIGIAN, CLARENCE LAMORA , | ) | |
| and MICHAEL CIRRI, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |
| | ) | |
| MCM MANAGEMENT CORP., | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KCK INDUSTRIAL, LLC, #1 POLYMER | ) | |
| SOURCE, INC., CHAD ELAM, KEITH ULM | ) | |
| and KENNETH ULM, | ) | |
| | ) | |
| Counter-Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

This messy case arises from the messy demolition project of a former coal

power plant on the southwest side of Chicago. MCM Management is the general

contractor for demolition and removal services on the site. MCM subcontracted some

of those services to Jenkins Environmental, Inc., which in turn subcontracted work

to Marine Technology Services, a demolition company that calls itself MTS. Jenkins and MTS entered into agreements with yet another company, KCK Industrials, for the sale of equipment and metals that have been removed from the site. Over the course of several months, KCK made numerous advances on these contracts but allegedly has never been made whole. As a result, KCK filed this lawsuit; now the operative pleading is the First Amended Complaint. In that pleading, KCK advances claims for breach of contract (Counts 1-4, 8); tortious interference with contract (Counts 5, 7); unjust enrichment (Counts 6, 9); promissory fraud (Count 10); common law fraud (Count 11); conversion (Count 12); and civil conspiracy (Count 13). R. 56, First Am. Compl.[1] MCM and its CEO Robert Mardigian move to dismiss Counts 1 through 6 and 9 through 13. R. 72-1, Defs.' Mot. Dismiss.

Not to be outdone, MCM filed counterclaims against KCK, as well as a company called #1 Polymer Source. R. 54, Counterclaims. Also targeted in the counterclaims are individuals Chad Elam, Keith Ulm, and Kenneth Ulm. *Id.* MCM alleges claims for tortious interference with contract (Count 1); common law fraud (Count 2); conversion (Count 3); and tortious interference with business expectancy (Count 4). The Counter-Defendants move to dismiss the Counterclaims. R. 74, Mot. Dismiss Counterclaims.

For the reasons set forth below, the motion to dismiss the First Amended Complaint is denied and the motion to dismiss the Counterclaims is granted in part

---

[1] This Court has diversity jurisdiction over the case. 28 U.S.C. § 1332. This suit is between parties of diverse citizenship, and the amount in controversy exceeds $75,000. The counterclaims arise out of the same transaction, occurrence, or series of transactions or occurrences, so supplemental jurisdiction applies. 28 U.S.C. § 1367.

and denied in part. This means that the litigation moves forward, though hopefully the Opinion provides an incentive to both sides to devote more attention to possibly resolving this case rather than throwing more resources into the myriad discovery skirmishes that they have fought.

## I. Background

For purposes of this opinion, and unless otherwise noted, the Court accepts as true the allegations in the First Amended Complaint and in the Counterclaims to the extent that allegations asserted in one pleading are not disputed by countervailing allegations in the other. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). When necessary, this Opinion will identify key disputed allegations.

The defunct Crawford Station coal power plant is the site of a demolition and redevelopment project designed to repurpose the plant into a distribution site for e-commerce and logistics companies. First Am. Compl. ¶ 21. HRE Crawford, LLC owned the real property at Crawford Station. R. 54, Counterclaims ¶ 17. In December 2017, HRE entered into a Remediation, Abatement, Recycling and Demolition Services Agreement (the General Contract) with MCM for demolition and removal services. *Id.* ¶ 16. HRE then assigned its rights, title and interest in the General Contract to HRP Exchange 55, LLC. *Id.* ¶ 18. Under the General Contract, MCM agreed to provide demolition and removal of all buildings and structures, including asbestos abatement and disposal of hazardous materials. *Id.* ¶ 19. The General Contract also gave MCM legal title to any scrap metal generated during its work and the exclusive right to sell such scrap for a profit. *Id.* ¶ 19-21.

3

MCM then subcontracted with Jenkins to conduct environmental abatement and demolition. First. Am. Compl. ¶ 22. Jenkins then subcontracted with MTS, which then contracted with KCK to take away and sell scrap metal removed from the Crawford Plant. *Id.*

## A. Jenkins Contract

MCM entered into its subcontract with Jenkins in late February 2018 (for convenience's sake, call it the Jenkins Contract). Counterclaims ¶ 22. After Jenkins began working on the project, Jenkins experienced cash-flow problems and approached MCM to request additional money. *Id.* ¶ 25. Rather than advance additional cash to Jenkins, MCM agreed to allow Jenkins to sell scrap metal removed from the site and keep a percentage of the sales. *Id.* ¶ 26. So the parties entered into an addendum to the Jenkins Contract in which Jenkins agreed to "perform [MCM's] full scope of work that it was engaged to perform by the project Owner," and "prepare all scrap identified by [MCM] for sale by [MCM] in a manner as directed by [MCM] to yield the highest sale price, but not exceed industry standards for processing of demolition scrap." *Id.*, Exh. B, Jenkins Contract, at 11, 16. MCM alleges that it did not assign Jenkins any *title* to scrap, and that scrap removed from the Crawford Plant expressly remained the property of MCM. Counterclaims ¶¶ 23, 29. To MCM's way of thinking, it merely assigned Jenkins the task of preparing and selling the scrap on MCM's behalf for MCM's benefit. *Id.* ¶ 29.

### B. KCK Contracts

### 1. Equipment Contract

In around September 2018, an MTS employee, Herb Hazzard, contacted KCK's Managing Member Chad Elam to ask if KCK would purchase equipment and machinery pulled out of the Crawford Plant during the initial stages of the demolition. First Am. Compl. ¶ 23. In early October 4, 2018, KCK and MTS agreed to a contract under which KCK would purchase machinery for $45,000 payable in two equal installments (the Equipment Contract). *Id.* ¶ 24. KCK agreed to pay money up front to finance the work needed to remove and store the purchased equipment. *Id.* ¶ 24-25. Around one week later, KCK advanced the first installment of $22,500. *Id.* ¶ 26. After KCK obtained one truckload of equipment, KCK paid the second installment of $22,500 in early November 2018. *Id.*

Soon after, work at the Crawford Plant slowed. First Am. Compl. ¶ 27. In November 2018, Hazzard informed Elam that Jenkins and MTS were having trouble removing the remaining equipment. *Id.* He assured Elam, however, that materials would be available soon, once environment abatement progressed further. *Id.* As of the filing of the First Amended Complaint, despite paying the full contract price, KCK has received about 15% of the equipment it paid for. *Id.* ¶ 28.

### 2. Transformer Contract

In January 2019, Clarence LaMora, the sole member of MTS, approached Elam at the demolition site about purchasing electric transformers from the Crawford Plant. First Am. Compl. ¶ 29. That month, MTS and KCK executed a bill of sale (call

it the Transformer Contract) for KCK to purchase transformers in exchange for $300,0000 over three installments—$100,000 up front, $100,000 upon removal of the largest transformer, and $100,000 upon removal of all the transformers listed in the Transformer Contract. *Id.* ¶ 30. In mid-January 2019, LaMora emailed a draft of the Transformer Contract to KCK, stating that Michael Cirri from Jenkins had obtained approval from MCM to enter the contract. *Id.* ¶ 31. MTS represented and warranted in the Transformer Contract that it had good title to the transformers and the right to sell them. *Id.* ¶ 33.

KCK made the initial payment on January 18, 2019 because Jenkins and MTS were adamant that they needed the funds to make payroll on that very day. *Id.* ¶ 34. One month later, on February 19, 2019, KCK paid the second installment after removal of the largest transformer. *Id.* ¶ 35. In mid-to-late February, LaMora approached Elam and Keith Ulm (another KCK member), requesting the final payment because all of the transformers allegedly had been removed. *Id.* ¶ 37. But Elam and Ulm responded that two transformers remained in the Crawford Plant. *Id.* ¶¶ 36, 37. Once again, LaMora replied that Jenkins and MTS would be unable to make payroll without the final payment. *Id.* ¶ 37. At this point, KCK had not received all the materials contracted for under either the Equipment Contract or the Transformer Contract. *Id.* ¶ 38. Nevertheless, on March 26, 2019, KCK made the final payment in reliance on LaMora's assurances that the remaining materials would be removed once the abatement progressed far enough. *Id.*

6

### 3. Scrap Contracts

Meanwhile, in late January 2019, MTS's LaMora asked KCK to contract for the removal of all ferrous and non-ferrous metals from the Crawford Plant. First Am. Compl. ¶ 39. Ferrous metals contain iron; non-ferrous metals, like copper and brass, do not. *Id.* Specifically, on January 30, during an on-site meeting at the Crawford plant, LaMora asked KCK to advance $500,000 for the Non-Ferrous Contract and another $500,000 for the Ferrous Contract. *Id.* ¶ 41. After some negotiation, the parties ultimately agreed that KCK would advance $250,000 for non-ferrous metals and $400,000 for ferrous metals. *Id.* Once again, LaMora explained to KCK that these advances were necessary to continue operations. *Id.* On several occasions, LaMora and Jenkins President Michael Cirri reported that the unions working on the Crawford Plant threatened to stop working. *Id.* LaMora also informed KCK that MTS had received a notice of tax lien from the IRS because of nearly $300,000 in unpaid income tax. *Id.*

Before KCK advanced the initial $250,000 for non-ferrous metals, it wanted assurances that MCM had authorized the deal. First Am. Compl. ¶ 42. Up to this point, KCK had been dealing primarily with LaMora from MTS. *Id.* ¶ 43. On February 7, 2019, Elam called Cirri (Jenkins's president), who confirmed that Jenkins and MTS had received authorization from MCM. *Id.* ¶ 44. As proof, Cirri forwarded to Elam a January 23, 2019 email from MCM's Chief Financial Officer, Craig Sickmiller, to Cirri (this email is important enough to get its own label: the

7

Sickmiller Email). *Id*. The email spells out an arrangement between MCM and Jenkins concerning scrap removed from the plant:

> P]lease confirm that the following confirms our mutual understanding of [Jenkin's] open sales order agreement for the Crawford Station project in Chicago.
>
> …
>
> - MCM's contract with [Jenkins] assumes that Jenkins will process scrap to the level that achieves a reasonably obtainable market value.
>
> - [Jenkins] will continue to provide sales orders for approval by MCM if adequate time allows for an adequate review of the items to be sold and their valuation. These orders will be documented and released from the site as approved. That sale will be recorded at full value and be credited against MCM's outstanding accounts payable obligation to [Jenkins].
>
> - If [Jenkins] does not have prior approval from MCM on a specific sale(s), the sale(s) will be covered by the open sales order. When an open sales order item(s) is shipped, the following procedures will be taken:
>
>> 1. All items sold will be weighed using the MCM scale onsite and documents via written description and pictures taken by a MCM representative.
>>
>> 2. [Jenkins] shall provide documentation of the value it received for the sale within seven days of shipping the item(s).
>>
>> 3. MCM shall evaluate the value of the item shipped and determine a valuation of the asset within fourteen days of the item being shipped.
>>
>> 4. MCM shall notify [Jenkins] of its valuation and shall update its asset sales system for the greater of the amount received or the market valuation as determined by MCM.
>>
>> 5. Upon establishing the valuation, Jenkin's accounts payable balance from MCM shall be credited by the amount of the sale as valued in item 4) above.

First. Am. Compl., Exh 5, 1/23/19 Sickmiller Email at 2. The parties dispute whether the Sickmiller Email demonstrates MCM's authorization of the scrap contracts.

The Sickmiller Email was good enough proof for Elam: on February 7, 2019, Elam executed the Non-Ferrous Contract on KCK's behalf and caused KCK to advance $250,000. First Am. Compl. ¶ 47. The Non-Ferrous Contract states that it had been made "with the express approval" of MCM. *Id*. ¶ 49. It estimated that at least 1,500,000 pounds of non-ferrous metal could be salvaged from the Crawford Plant. *Id*. ¶ 50. Under the contract, KCK agreed to advance $250,000, which could be replenished three times once 80% of the advance had been offset by KCK's sales of the metal on the secondary market. *Id*. ¶ 51. In return Jenkins and MTS agreed to provide all non-ferrous metals produced at the Crawford Plaint to KCK and agreed that KCK would take title to the metal as it was removed. *Id*. ¶ 52. Jenkins and MTS also stated that they had good title to the non-ferrous metals and the right to convey them. *Id*. ¶ 53. KCK picked up its first truckload of non-ferrous metal about a week later. *Id*. ¶ 54.

After signing the Non-Ferrous Contract, Elam presented copies of the Sickmiller Email and the Non-Ferrous Contract to MCM's site manager, Mark Hutchinson. First Am. Compl. ¶ 47. Hutchinson confirmed KCK's rights to all non-ferrous metal removed from the Crawford Plant. *Id*. Soon after that, LaMora approached Elam about finalizing an agreement for ferrous metals. *Id*. ¶ 55. LaMora again requested an advance in order to help fund operations. *Id*. KCK agreed to advance $400,000, relying on LaMora, who stated that the demolition was almost complete, metals would be removed more quickly, and that KCK soon would be able to recover on its advances. *Id*. ¶ 56. On March 7, 2019, the parties executed the

Ferrous Contract, which stated it was expressly approved by MCM. *Id*. ¶¶ 57-58. The contract also stated that there were more than 30,000 metric tons of ferrous metal at the Crawford Plant. *Id*. ¶ 58. As with the Non-Ferrous Contract, the Ferrous Contract provided that (1) Jenkins and MTS had good title to the Ferrous metal and the right to convey them; (2) KCK's advance would be repaid through sales on the secondary market; (3) KCK would receive all ferrous metal removed from the Crawford Plant; and (4) KCK would receive title to the ferrous metal as it was removed. *Id*. ¶¶ 59-61.

On March 8, 2019, KCK wired $400,000 to MTS. First Am. Compl. ¶ 63. Elam then took a copy of the Ferrous Contract to Hutchinson on site. *Id*. Hutchinson copied the Ferrous Contract, scanned it, and emailed a copy back to Elam. *Id*.

Based on records obtained during discovery, MCM alleges that KCK failed to report shipments of 17 ferrous loads and 7 non-ferrous loads with estimated values of $61,952.52 and $136,159.25, respectively. Counterclaims ¶ 44. MCM also alleges that KCK understated the value of 12 other loads removed from the Crawford Plant. *Id*. MCM estimates that KCK undervalued those 12 loads by a combined total of $105,700.67. *Id*. MCM further alleges, based on other documents produced during discovery, that KCK "grossly misrepresented" the type, amount, and value of scrap it was taking from the project site. *Id*. ¶ 45.

### B. Additional Advances

By mid-March 2019, KCK had received only $30,000 worth of non-ferrous metals and almost no ferrous metals from the site. First Am. Compl. ¶ 66. In fact, at

this time, KCK had advanced a total of $995,000 under the four contracts but had not been made whole on any of them. *Id*.

In early April, Cirri called Elam to ask for even more advances. First Am. Compl. ¶ 68. This time, at Elam's request, MCM CEO Robert Mardigian joined the call. *Id*. Mardigian told Elam that MCM, Jenkins, and MTS could not remove metals without additional funds. *Id*. He stated that "we're broke" and "as soon as we get through this abatement our payroll will go down, and we'll be able to pay [KCK] back its advances." *Id*. On April 4, Elam, Cirri, and Mardigian participated in additional phone calls. *Id*. ¶ 71. The three eventually agreed that KCK would advance an additional $100,000. *Id*. In exchange, KCK's proceeds from future metal sales would increase $5 per ton until its prior advances were recouped or the parties reached an alternative arrangement. *Id*. The next day, on April 5, Elam emailed Cirri confirming these additional terms in writing and wired the $100,000 advance. *Id*. ¶ 72.

### C. Scrap Sales to Other Buyers

On May 2, 2019, Elam and Keith Ulm (another member of KCK) were on site at the plant when they noticed that other companies' trucks were leaving the site with metal. First Am. Compl. ¶¶ 74-75. Elam approached an MTS employee, Lynette Olivo, who admitted that other companies were buying metals from the Crawford Plant and showed Elam the tickets of those sales. *Id*. ¶ 76. That same day, Elam called Mardigian, who admitted to double-selling metal because MCM was struggling financially and needed the extra cash to make payroll. *Id*. ¶ 78. Mardigian

acknowledged KCK's exclusive rights to the metals at the Crawford Plant and vowed to stop the sales to other buyers immediately. *Id*.

MCM kept its word—at least until mid-July. First Am. Compl. ¶ 79. On around July 11, 2019, LaMora called Elam, asking when KCK would be paying for the metal that had been shipped that week. *Id*. ¶ 83. Elam responded that KCK had not taken any metal from the site that week and demanded to review the scale tickets for the week's shipments. *Id*. Those tickets demonstrated that MCM, Jenkins, and MTS had resumed selling to other buyers. *Id*. Elam called Mardigian demanding an explanation. *Id*. ¶ 84. This time, Mardigian was unapologetic, retorting "it's my metal, and I'll do what I want with it." *Id*.

KCK learned that one of those other buyers was Sims Metal Management, a scrap-metal recycler based in Chicago. First Am. Compl. ¶¶ 11, 85. KCK was familiar with Sims because, of all things, KCK was already selling Sims scrap removed from the Crawford Plant. *Id*. ¶ 48. In connection with those prior sales, KCK had travelled to Sim's offices to inform them of their exclusive rights to non-ferrous and ferrous metals from the Crawford Plant. *Id*. ¶¶ 48, 65. Elam called Patrick Forebaugh, who was a Sims salesperson, to demand that Sims stop taking metal from the Crawford Plant because Sims already knew of KCK's exclusive rights. *Id*. ¶ 85. Despite this demand, Sims continued to ship metal from the Crawford Plant until as late as July 26, 2019. *Id*. KCK then engaged a lawyer, who sent MCM, Jenkins, MTS, and Sims cease-and-desist letters, asserting KCK's exclusive rights to all metal removed from the Crawford Plant. *Id*. ¶ 86.

KCK also learned that another company, Ferrous Processing and Trading Company, was receiving metals removed from the Crawford Plant. First Am. Compl. ¶ 87. On July 29, 2019, KCK (through its counsel) sent a cease-and-desist letter to that company, too. *Id*. KCK alleges that, as of the filing of the First Amended Complaint, MCM, Jenkins, and MTS still had not stopped selling metal to third parties, including to Sims and Ferrous Processing. *Id*. ¶ 88.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (alteration in original) (cleaned up).[2] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to focus litigation on the merits of a claim rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)) (cleaned up).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain

---

[2]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In ruling on a motion to dismiss, a court accepts as true all well-pleaded facts alleged and draws all reasonable inferences from those facts in favor of the non-movant. *Dixon v. Page*, 291 F.3d 485, 486 (7th Cir.2002). The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

### A. MCM's Motion to Dismiss

### 1. Breach of Contract (Counts 1-4)

KCK alleges that MCM breached all four of its contracts. First Am. Compl. ¶¶ 92-117. MCM in turn moves to dismiss all of those claims. *See* Defs.' Mot. Dismiss at 10-16. According to MCM, KCK fails to sufficiently plead facts showing that MCM authorized Jenkins or MTS to bind MCM in any contract with KCK. *See id.* at 10. To adequately state a claim for breach of contract, KCK must allege: (1) that the parties entered into a valid and enforceable contract; (2) KCK substantially performed; (3) the other side breached the contract; and (4) damages.[3] *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015); *see also Carbone v. Nueva Constr. Grp., L.L.C.*, 83 N.E.3d 375, 380 (Ohio Ct. App. 2017). MCM contests the first element, arguing that

---

[3]Three of KCK's four contracts are governed by Ohio law. R. 56-3 ¶ 5; 56-6 at 5; 56-7 at 5. To the extent that the Equipment Contract, which has no choice-of-law provision, is governed by Illinois law, the elements for breach of contract are the same.

KCK fails to allege the existence of any valid and enforceable contracts with MCM. *See* Defs.' Mot. Dismiss at 10-16. As explained next, however, the breach-of-contract claims survive because KCK sufficiently alleges that MCM and Mardigian ratified the contracts. Also, the allegations adequately set forth that Jenkins and MTS had both actual and apparent authority to bind MCM in contract.

### a. Ratification

Taking ratification first, a principal is bound by a contract if, knowing the material facts about the negotiation and execution of the contract, the principal effectively ratifies the contract entered into by someone who purported to execute the contract on the principal's behalf.[4] *Lawcock v. U.S.Trotting Ass'n*, 204 N.E.2d 802, 804 (Ill. App. Ct. 1965). Ratification is a theory of liability independent of actual authority: if a corporation ratifies a contract, then it does not matter that the signatory on the contract lacked the authority to bind the corporation in the first place. *George F. Mueller & Sons, Inc. v. N. Illinois Gas Co.*, 299 N.E.2d 601, 603 (Ill. App. Ct. 1973). One way a principal can be deemed to have ratified a contract is to take, when the principal knows the important facts of the deal, a position that is inconsistent with rejecting the transaction. *Karetzkis v. Cosmopolitan Nat'l Bank*, 186 N.E.2d 72, 75 (Ill. App. Ct. 1962). For example, if the principal seeks or retains the benefits of the deal, then that would be evidence of ratification. *Id.* And

---

[4]The parties dispute whether Ohio, Michigan, or Illinois law applies to the agency question. *See* Defs.' Mot. Dismiss at 10 n.2; Pl.'s Resp. Br. at 3-4 n.3. But the parties agree that no material differences exist amongst any of those laws. *See id.*

15

ratification need not arise from explicit words or action; it may be implied from the conduct of the parties. *Mueller & Sons*, 299 N.E. at 603.

Under those governing principles, KCK adequately states claims for breach of contract because it sufficiently alleges that MCM ratified those contracts. The allegations that support ratification are:

- MCM site manager Mark Hutchinson confirmed that KCK was entitled to all non-ferrous metals when Elam showed Hutchinson a copy of the Sickmiller Email and the Non-ferrous Contract. First. Am. Compl. ¶ 47.

- After executing the Ferrous Contract, Elam took a copy of it to Hutchinson. Hutchinson scanned it and emailed a copy back to Elam. *Id*. ¶ 63.

- In early April 2019, Mardigian told Elam that additional advances were needed in order to sustain operations long enough to repay KCK on its earlier advances. *Id*. ¶ 68. When read in favor of KCK, Mardigian was referring to prior advances on all four contracts.

- On April 4, 2019, Elam, Mardigian, and Cirri discussed an alternative proposal under which KCK's proceeds from all future metal sales would be increased $5 per ton until KCK's prior advances were recouped. *Id*. ¶ 71. Again, viewed in KCK's favor, this proposal referred to KCK's prior advances on all four contracts.

- When Elam discovered that MCM was double-selling scrap metal, Mardigian admitted to doing so and then "apologized—explicitly acknowledging Plaintiff's exclusive right to the metals from the Crawford Plant under the Non-Ferrous and Ferrous Contracts." *Id*. ¶ 78.

- In early June 1, 2019, MCM informed KCK that MCM would now handle sorting of metal at the staging area. *Id*. ¶ 80.

These allegations are enough to establish that—regardless of whether Jenkins and MTS had authority to bind MCM at the start—MCM ratified the contracts because it knew the material terms of each of the four contracts, benefitted from them (with

MCM's subcontractors obtaining substantial advances from KCK), and acted in a way that is inconsistent with rejecting the contracts.

To resist this conclusion, MCM argues that other allegations in the First Amended Complaint demonstrate that MCM repudiated the contracts. Specifically, MCM points to two allegations: (1) MCM, Jenkins, and MTS sold scrap to other recyclers "in contravention of Plaintiff's contracts"; and (2) Mardigian told Elam "it's my metal, and I'll do what I want with it" when Elam confronted him about double-selling scrap metal for the second time. R. 110, Defs.' Reply Br. at 2-3. That is a rather bold interpretation of those allegations at the pleading stage: viewed in KCK's favor, those are really alleged *breaches* of the contracts. Maybe this is MCM's version of the old adage "the best defense is a good offense." In any event, when viewed in KCK's favor, the alleged breaches most certainly do not comprise evidence of repudiation. Not to mention that, as alleged by KCK and supported with competent evidence, Mardigian apologized and explicitly acknowledged KCK's right to ferrous and non-ferrous metals when Elam confronted him the *first* time about double-selling. First. Am. Compl. ¶ 78.

On whether MCM accepted the contracts' benefits, here, too, KCK alleged more than enough. In MCM's view, KCK never alleged that the monetary advances flowed *directly* to MCM. Defs.' Reply Br. at 6. But KCK paid MCM's subcontractors to keep them afloat and operating so that they could perform services for MCM. The allegations, viewed in KCK's favor (and viewed with just plain common sense), establish that MCM benefited from the subcontractors' solvency, because they could

17

continue to perform their obligations under the General Contract. See First Am. Compl. ¶¶ 3 ("[o]n a regular basis, MCM, JEI and MTS struggled to make payroll or cover expenses"), 4. ("[t]o stay above water … MCM, JEI, and MTS induced Plaintiff to advance the $1.1. million"), 68 ("Mardigian said MCM, JEI, and MTS would be unable to remove the metal Plaintiff already had contracted for without additional funds … [w]e're broke"). KCK adequately alleged that MCM knew about the contracts, benefitted from them, and ratified them. The ratification theory survives.

### b. Actual Authority

Aside from ratification, KCK also has adequately alleged that Jenkins and MTC had actual authority to bind MCM. The general rule is that a principal is bound by a contract executed by the principal's agent, so long as the agent acted with actual (or apparent) authority and the parties understood that the agent was acting on behalf of the principal. *Lawcock v. U.S. Trotting Ass'n*, 204 N.E.2d 802, 804 (Ill. App. Ct. 1965) (cleaned up). Actual authority may be express or implied. *C.A.M. Affiliates, Inc. v. First American Title Ins. Co.,* 715 N.E.2d 778, 783 (Ill. 1999). An agent has express actual authority when the principal explicitly grants the agent the authority to perform a particular act. *Id.* In contrast, implied actual authority arises from the surrounding facts and circumstances, rather than an explicit grant of authority. *Wasleff v. Dever*, 550 N.E.2d 1132, 1138 (Ill. 1990). An agent has implied authority to do anything reasonably necessary to effectively execute the express authority wielded by the agent. *Advance Mortg. Corp. v. Concordia Mut. Life Ass'n*, 481 N.E.2d 1025, 1029 (Ill. App. Ct. 1985). Either way, only the words or conduct of the alleged

18

*principal*, not the alleged agent, can establish the [actual or apparent] authority of an agent. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000).

Here, KCK adequately alleged that Jenkins and MTS had actual authority to bind MCM to the contracts. To start, MCM and Jenkins entered into an addendum that authorized Jenkins to sell scrap from the site:

> [Jenkins] shall prepare all scrap identified by Contractor for sale by the Contractor in a manner as directed by Contractor to yield the highest sales price, but not to exceed industry standards for processing of demolition scrap. Other [property, plant, and equipment] shall be identified and segregated for sale by [Jenkins] and sold by [Jenkins] on behalf of the Contractor as an asset sale so long as the sale of the [property, plant, and equipment] exceeds the scrap value of the items identified.

Counterclaims, Exh. B, Jenkins Contract at 11.[5] Read in the light most favorable to KCK, this provision authorizes Jenkins to enter contracts on behalf of MCM to sell scrap from the site.

What's more, viewed in KCK's favor, the Sickmiller Email demonstrates MCM's express authorization of Jenkins and MTS to enter into the Non-Ferrous and Ferrous Contracts. First Am. Compl. ¶¶ 44-45. MCM protests this conclusion, arguing that the email makes no specific mention of KCK; requires Jenkins to obtain

---

[5]Typically, a district court can consider documents attached to a motion to dismiss as part of the pleadings "if they are referred to in the plaintiff's complaint and are central to [the] claim." *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) (quoting *188 LLC v. Trinity Indus., Inc.,* 300 F.3d 730, 735 (7th Cir. 2002)). Here, the Jenkins Contract was attached as an Exhibit to MCM's Counterclaims, which is formally a separate pleading from the First Amended Complaint. But KCK references the Jenkins Contract repeatedly in the First Amended Complaint, and it is central to its breach of contract claims, First Am. Compl. ¶¶ 1, 22; nor does anyone contest the contract's authenticity. So consideration of the Jenkins Contract does not require converting the dismissal motion into a summary judgment motion.

MCM's approval for spot sales of scrap; and does not authorize Jenkins to pledge *all* of the scrap from the side. Defs.' Mot. Dismiss at 8. But at the pleading stage, KCK enjoys the benefit of all reasonable inferences, and it is reasonable to interpret the Sickmiller Email as conferring actual authority to Jenkins to enter into the Non-Ferrous and Ferrous Contracts.

First, there is no need for a specific mention of the buyer of the scrap; *no* buyer is mentioned specifically by Sickmiller, and in context it would make little sense to try to limit the potential buyers to a specific list. Second, the pre-approval requirement is limited, with an explicit exception for the lack of adequate time to obtain MCM's pre-approval: "[Jenkins] will continue to provide sales orders for approval by MCM i*f adequate time allows* for an adequate review of the items to be sold and their valuation," and "[i]f [Jenkins] does not have prior approval from MCM on a specific sale(s), the sale(s) will be covered by the open sales order." First Am. Compl., Exh. B., 1/23/19 Sickmiller Email at 2 (emphasis added). Third and last, nothing in the email bans Jenkins from selling all of the scrap. So, none of the objections posed by MCM undermine the Sickmiller Email's conferral of express authorization to Jenkins to sell the scrap on MCM's behalf. No doubt MCM will take discovery to try to undermine this interpretation, and at a trial, KCK would not get the benefit of viewing the evidence in its favor. But for now, KCK has adequately pled that Jenkins had actual authority to enter into the contracts.

### c. Apparent Authority

As an alternative to actual authority, KCK also has adequately alleged that Jenkins had apparent authority to enter into the contracts on MCM's behalf. Apparent authority arises when a principal, through words or conduct, creates a reasonable impression that the putative agent has authority to perform a certain act. *Mateyka v. Schroeder*, 504 N.E.2d 1289, 1295 (Ill. App. Ct. 1987). MCM contends that the key missing piece is that KCK does not allege that MCM *directly* said anything to KCK nor did MCM *directly* take any action toward KCK. Defs.' Mot. Dismiss at 14. But nothing in Illinois case law requires that the words or conduct of the principal be said or done *directly* to the other party. To the contrary, the Illinois Appellate Court has rejected that proposition. In *Mateyka v. Schroeder*, a land owner sold farmland in a single deal to eight buyers who acted jointly through just one of the buyers. 504 N.E.2d at 1291. In resisting a finding of agency, the buyers argued that "the fact that plaintiff had no communication with the purchasers, except [the one buyer], prior to the sale belies the existence of any agency." *Id.* at 1296. But the Illinois Appellate Court rejected that argument, deeming the lack of direct communication between the principals and the land owner to "be of no consequence" in light of the other circumstances. *Id.* So there is no bright-line requirement that a principal directly interact with the contracting party. Instead, all that is necessary is that "the principals place an agent in a situation where [the agent] may be presumed to have authority to act for them." *See Mateyka,* 504 N.E.2d at 1295.

The cases relied on by MCM do not say otherwise. MCM cites *Bethany Pharmacal v. QVC*, 241 F.3d 854, 859-60 (7th Cir. 2001), but all that MCM extracts

from that case are generalized statements from the part of the opinion setting forth general principles: "An agent's apparent authority can only be determined by evaluating the principal's conduct toward the third party. Specifically, the principal must do something to lead the third party to believe that the agent is authorized to act on its behalf." *Id.* at 860. Nothing about that description of uncontroversial agency principles says that *direct* interaction between the principal and the contracting party is required. Indeed, just two sentences later, the opinion goes on to cite *Mateyka* for the proposition that "an apparent agency may arise, however, from the silence of the alleged principals when they knowingly allow another to act for them as their agent." *Id*. What's more, *Bethany Pharmacal*'s holding did not turn on anything like a requirement that a principal must directly interact with the contracting party. Instead, the Seventh Circuit held that no apparent agency arose because the purported principal (QVC, the television home-shopping network) repeatedly reminded interested vendors—both in writing and verbally—that QVC would only enter into a binding contract through a purchase order. *Id.* at 860. Nor did QVC "stand idly by and accept the benefits of the contracts." *Id*. That was the linchpin reasoning of the case; the proposition that MCM offers was not at issue in the case. This is the difference between drawing from an actual *holding* of a precedent versus picking out a few choice sentences from an opinion's background summary of the law.

The same goes for MCM's reliance on *Kaporovskiy v. Grecian Delight Foods, Inc.*, 787 N.E.2d 268, 272 (Ill. App. Ct. 2003). In summarizing general agency principles, the opinion says, "Only the alleged principal's words and conduct, not

those of the alleged agent, establish the agent's authority." *Id*. Again, nothing in that general statement requires that the principal's words and conduct have to be *directly* said or done to the contracting party. And, again, the holding in *Kaporovskiy* did not turn on MCM's proposed principle. Instead, the opinion simply relied on the absence of any relationship between the putative agent and the defendant. *Id*. at 272-73. So there is no bright-line requirement that MCM had to directly interact with KCK in order for apparent authority to arise.

At this stage of the case, then, KCK has adequately pled facts from which to infer KCK's reasonable belief that Jenkins and MTS had apparent authority to bind MCM to the contracts. MCM subcontracted Jenkins, who subcontracted with MTS, to conduct abatement and demolition at the Crawford Plant. First Am. Compl. ¶ 22. Jenkins and MTS then contracted with KCK on MCM's behalf. *Id*. The Sickmiller email confirmed MCM's general authorization for Jenkins to sell scrap on MCM's behalf. *Id*. ¶ 44. And MCM accepted the benefits of the contracts. *See id*. ¶¶ 47, 63, 68, 71, 78, 80. The breach-of-contract claims survive on an apparent authority as well.

## 2. Conversion (Count 12)

Moving on (but actually not far) from the contract claims, MCM next targets the claim for conversion. To state a claim for a conversion, a plaintiff must plead (1) right to the property; (2) absolute and unconditional right to immediate possession of the property; (3) demand for possession; and (4) the defendant's wrongful and unauthorized control, dominion, or ownership over the property. *Loman v. Freeman*, 890 N.E.2d 446, 461 (Ill. 2008). MCM argues that it never assigned to KCK any

23

ownership interest in property removed from the Crawford Plant. Defs.' Mot. Dismiss at 17. Again, MCM contends that Jenkins and MTS lacked the authority to convey any equipment or materials. *Id.*

But those contentions were rejected in deciding the claims for breach of contract. Because KCK has adequately stated claims for breaches of contracts, it has adequately pled a right to the property that is the subject of those contracts. Moreover, KCK alleged its right to immediate possession of the scrap. It alleged full payment of its obligations under the Equipment and Transformer Contracts, which entitled it to the property specifically listed under each contract. *See* First Am. Compl. ¶¶ 26, 28, 30, 38. Also, KCK plausibly alleged that it received title to the non-ferrous and ferrous metals *as they were removed* from the Crawford Plant. *Id.* ¶¶ 52, 60. The claim for conversion survives.

### 3. Tortious Interference and Unjust Enrichment (Counts 5-6)

Next, MCM argues that the clams for tortious interference and unjust enrichment must also be dismissed because KCK failed to adequately plead these claims in the alternative to its breach of contract claims.[6] Defs.' Mot. Dismiss. at 17-18. The "downfall" of Counts 5 and 6, MCM contends, is that they incorporate

---

[6]A party cannot tortiously interfere with its own contract, nor can it tortiously interfere with any business expectancies created by that contract. *Heiman v. Bimbo Foods Bakeries Distribution Co.*, 902 F.3d 715, 720 (7th Cir. 2018) (cleaned up). When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract. *Util. Audit, Inc. v. Horace Mann Serv. Corp.,* 383 F.3d 683, 688–89 (7th Cir. 2004).

24

Paragraphs 1 through 91 "as if fully set forth herein"—which presumably would include the allegations that MCM was a party to the four contracts.[7] *Id.* at 18.

If this sounds like an argument that elevates form over substance, that's because it does just that. It is crystal clear that KCK pleads Counts 5 and 6 in the *alternative* to the breach-of-contract claims against MCM. *See* First Am. Compl. ¶¶ 119, 125 ("[t]o the extent MCM is found not to be a party to any contract with Plaintiff ...."). There is no reason to dismiss the claims just to jump through the hoop of repleading these claims with references to a subset of the factual allegations. Counts 5 and 6 survive.

### 4. Fraud (Counts 10-11)

The fraud claims are up next. MCM moves to dismiss the claims for promissory fraud (Count 10) and common law fraud (Count 11), arguing that (1) KCK failed to meet the heightened pleading requirements of Rule 9(b); and (2) KCK made no allegations that MCM made any representations *before* the four contracts were executed. Defs.' Mot. Dismiss at 18-19. As explained next, the fraud claims also survive.

---

[7]MCM cites several cases to support its argument that this deficiency necessarily dooms KCK's quasi-contract claims. *See* Defs.' Mot. Dismiss at 18. But those cases are readily distinguishable, because they involved claims that were not pled in the alternative to the breach-of-contract claims, which KCK did. *See Inteliquent, Inc. v. Free Conferencing Corp.*, No. 16-CV-06976 (N.D. Ill. Mar. 30, 2017), R. 56, Second Am. Compl. ¶¶ 249-258 (failing to clearly plead unjust enrichment in the alternative); *Cole-Haddon, Ltd. v. Drew Philips Corp.*, 454 F. Supp. 2d 772, 774, No. 06-CV-00401 (N.D. Ill. 2006), R. 1, Compl. ¶¶ 29-33 (same for quantum meruit claim); *Heiman v. Bimbo Foods Bakeries Distribution Co.*, No. 17-CV-4065, (N.D. Ill. Oct. 18, 2017), *aff'd sub nom.*, 902 F.3d 715 (7th Cir. 2018), R. 5, Am. Compl. ¶¶ 43-48 (same for tortious interference claim).

As a threshold matter, KCK argues that its fraud claims need not satisfy the requirements of Rule 9(b) to the extent that the claims rely on a theory of vicarious liability. R. 97, Pl.'s Resp. Br. at 18-19. In support, KCK cites *Guaranty Residential Lending, Inc. v. International Mortgage Center*, 305 F. Supp. 2d 846, 853 (N.D. Ill. 2004). But all that case says is that Rule 9(b) requirements do not apply to the allegations that are offered to establish the *agency* relationship. *See id.*, 305 F. Supp. 2d at 853 ("[t]hus an agency relationship establishing vicarious liability for fraud generally does not have to be pleaded with particularity"). Rule 9(b)'s heightened pleading requirements still apply to KCK's *fraud* allegations.

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Generally speaking, this requires that KCK's complaint "state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (cleaned up). Put differently (and again generally speaking), the complaint "must describe the who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441-42 (cleaned up). Rule 9(b)'s purpose "is to ensure that the party accused of fraud … is given adequate notice of the specific activity that the plaintiff claims constituted the fraud so that the accused party may file an effective responsive pleading." *Lachmund v. ADM Inv'r Servs., Inc.*, 191 F.3d 777, 783 (7th Cir. 1999).

Here, remember that KCK has adequately pled that Jenkins and MTS were acting as MCM's agents. On the remaining question of whether KCK sufficiently alleged the fraud with particularity, the answer is yes. The allegations specifying the fraud set forth a tale of KCK repeatedly relying on the representations of Jenkins and MTS to persuade KCK to advance hundreds of thousands of dollars:

- Jenkins and MTS represented that they lacked sufficient funds to continue with the abatement and demolition, and that representation in turn induced KCK to advance $1.1 million. First Am. Compl. ¶¶ 3-4.

- In early October 2018, Jenkins and MTS represented in the Equipment Contract that it would provide the equipment in exchange for $45,000. *Id.* ¶ 24-25.

- In November 2018, after progress on the equipment slowed, Jenkins and MTS represented (through Elam) that the companies would be able to get the remaining equipment after more environmental abatement had been completed. *Id.* ¶ 27.

- In January 2019, MTS's LaMora told Elam on site that Jenkins and MTS wanted to sell a transformer to KCK in order to cover the shortfall from late payments from MCM. *Id.* ¶ 29.

- On January 18, 2019, KCK paid the initial $100,000 on the Transformer Contract because Jenkins and MTS were adamant that they needed it to make payroll. *Id.* ¶ 34.

- Around mid-to-late February 2019, LaMora approached Elam and Keith Ulm on site and asked them to transfer the final payment under the Transformer Contract because Jenkins and MTS needed to make payroll. *Id.* ¶ 37.

- On around March 26, 2019, KCK paid the final installment under the Transformer Contract, relying on LaMora's assurance that the advances would be recouped as soon as abatement progressed far enough to remove the remaining materials. *Id.* ¶ 38.

- From mid-January to early February 2019, LaMora, Elam, Keith Ulm, and Cirri participated in a number of in-person, email, and telephone communications whereby LaMora insisted that KCK purchase metals by

advancing more money so that Jenkins and MTS could cover expenses. *Id.* ¶ 40.

- In a January 30, 2019 meeting in MTS' on-site office, LaMora asked KCK to advance money for scrap in order to fund operations. *Id.* ¶ 41.

- KCK advanced $400,000 for ferrous metals based on LaMora's representations that the initial demolition was complete, metals would be removed quickly thereafter, and KCK would then recoup its earlier advances. *Id.* ¶ 56.

- Cirri and Lamora told KCK that the Crawford Plant faced difficulties such as a threatened union work stoppage and IRS lien. *Id.* ¶¶ 41, 145.

- Jenkins and MTS participated in making disingenuous promises that were an artifice to obtain additional cash from KCK. *Id.* ¶ 146.

These are the necessary allegations on who, what, where, when and how of the fraud. *See Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011). Relying on these allegedly false representations, KCK paid advance after advance.

KCK also adequately alleged that MCM directly made fraudulent representations to KCK. In early April 2019, MCM's Mardigian participated in a phone call with Cirri and Elam. First Am. Compl. ¶ 68. In the call, Mardigian represented to Elam that additional advances were needed in order to remove metals. *Id*. Specifically, Mardigian represented, allegedly with fraudulent intent, that "we're broke" and "[a]s soon as we get through this abatement, our payroll will go down, and we'll be able to pay [KCK] back its advances." *Id*. The fraud claims survive.

### 5. Civil Conspiracy (Count 13)

The final argument on MCM's dismissal motion is that the claim for civil conspiracy must fail. But the sole reason offered by MCM is that KCK failed to

28

adequately allege an underlying tort in furtherance of a conspiracy. Defs.' Mot. Dismiss at 20-21. This argument fails because, as explained earlier, the claims for conversion, tortious interference, unjust enrichment, and fraud survive. So the conspiracy claim too survives.

### B. Motion to Dismiss the Counterclaims

Turning to KCK's motion to dismiss the counterclaims brought by MCM, three overarching arguments are advanced by KCK. First, KCK argues that the factual allegations do not sufficiently state a claim against the individual Counter-Defendants—Chad Elam, Keith Ulm, and Kenneth Ulm—as well as against the separate company, Polymer. Mot. Dismiss Counterclaims at 2. This Opinion will discuss the adequacy of the allegations as to each of those Counter-Defendants when the Court analyzes each counterclaim one-by-one.

KCK's second overarching argument is that the counterclaims are supposedly "hopelessly contradictory" because MCM alleges, on the one hand, that it has no contracts with KCK and received no money from KCK on any scrap sales. Mot. Dismiss Counterclaims at 2; Counterclaims ¶ 30, 41. Yet, on the other hand, MCM also alleges that KCK fraudulently induced MCM into accepting less money for scrap purchased by KCK. Mot. Dismiss Counterclaims at 2; Counterclaims ¶ 45. But this is nothing more than pleading in the alternative. Federal Rule of Civil Procedure 8 says that a "party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if *any of them is sufficient*."

Fed. R. Civ. P. 8(d)(2) (emphasis added). The rule also provides that a "party may state as many separate claims or defenses as it has, *regardless of consistency*." Fed. R. Civ. P. 8(d)(3) (emphasis added).

Applying this permission to plead in the alternative, and taking reasonable inferences in favor of MCM, there are not fatally inconsistent contradictions in the Counterclaims. MCM maintains that no contracts bound it to provide scrap from the site to KCK, and the moneys paid by KCK were not paid to MCM; the subcontractors received the funds. But if those contracts were indeed binding, then—in the alternative—MCM and its subcontractors received less money than they should have. So even if none of KCK's advances flowed directly into MCM's coffers, Counterclaims, ¶ 41, MCM nevertheless had a financial interest in the solvency of its subcontractors, *see id.* ¶¶ 25-28. What's more, MCM alleged it that was entitled to a share of all profits made on Jenkin's scrap sales. *Id.* ¶ 26. Even if there was no valid contract between KCK and MCM, KCK can still make a false statement about the scrap's value resulting in harm to MCM. Ultimately, the Counterclaims are nothing more than pled in the alternative, and the purported contradictions are no reason to dismiss the counterclaims.

Third, KCK argues that the claims for conversion (Count 3) and tortious interference with business expectancy (Count 4) fail to state a claim because MCM admits in the Counterclaims that it entered into a binding contract with KCK. Mot. Dismiss Counterclaims at 2-3. Not so. Again, reading all reasonable inferences in

favor of MCM, MCM adequately alleged that Jenkins lacked authority to bind MCM in contract with KCK. For example, MCM alleged:

- Jenkins has no ownership rights to scrap. Counterclaims ¶ 24.

- MCM did not assign title to scrap; rather, it assigned Jenkins the task of preparing and selling the scrap on MCM's behalf. *Id.* ¶ 29.

- MCM did not have any contracts with KCK. *Id.* ¶ 30.

- The Sickmiller Email did not grant Jenkins any rights to scrap metal, or permit Jenkins any greater rights to the sale of scrap than those provided in the addendum to the JEI Contract. *Id.* ¶ 32.

- MCM did not approve the Non-Ferrous Contract or the Ferrous Contract. *Id.* ¶ 36.

Again, the Counterclaims simply pled in the alternative: there were no binding contracts between KCK and MCM, but if there were, then MCM is entitled to relief on other grounds. Thus, the claims for conversion and tortious interference cannot be dismissed on this basis.

Apart from the overarching arguments, KCK also makes arguments that are specific to each claim. The Court will address each of those in turn.

### 1. Tortious Interference with Contract (Count 1)

First is the claim for tortious interference with contract. To succeed on this claim, MCM must adequately allege: (1) the existence of a contract; (2) the defendant's awareness of the contract; (3) the intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages. *Cody v. Harris*, 409

F.3d 853, 859 (7th Cir. 2005). KCK offers two arguments why the claim has been inadequately alleged.

*Unjustified Conduct.* First, KCK argues that MCM failed to allege any unjustified conduct by KCK. Mot. Dismiss Counterclaims at 10. To KCK's way of thinking, MCM merely alleges that KCK withheld KCK's own money, to which Jenkins had no pre-existing interest. *Id.* KCK also cites several non-binding cases to support the proposition that parties may refuse to advance funds without fear of liability for tortious interference. *Id.*

This argument misapprehends KCK's tortious-interference claim. The heart of the claim is not *whether* it was permissible for KCK to refuse to advance money. The problem is *why*. MCM alleges that KCK, despite being aware of the Jenkins Contract and MCM's financial struggles, took advantage of MCM's vulnerability by conditioning the cash advances on Jenkins's agreement to grant rights to *all* scrap. Counterclaims ¶¶ 37, 39. From this, the reasonable inference is that KCK used the leverage of holding back on advances to secure exclusive rights to the scrap—which Jenkins was (allegedly) not authorized to do under its contract with MCM. *Id.* So KCK unjustifiably used the hold-back on the advances to induct Jenkins to breach its contract with MCM.

The cases cited by KCK in support of this argument are all distinguishable from the situation here. In *Jackson v. State Bank of Wapello*, a bank refused to advance loan disbursements to a struggling farmer. 488 N.W.2d 151, 1555 (Iowa 1992). The farmer claimed that this interfered with the mortgage on his farm, which

he owed to another bank. *Id.* at 157. *Jackson* held that the evidence was insufficient to sustain the claim because the bank had a right to refuse funds when it deemed itself insecure. *Id.* Unlike the allegations here, there are no facts in *Jackson* suggesting that the bank took advantage of the farmer to then induce the farmer to secure *even greater* benefits to the bank and to induce the farmer to breach a contractual promise owed to someone else.

The same goes for *Nitzberg v. Zalesky*, 370 So. 2d 389 (Fla. Dist. Ct. App. 1979). There, a lender refused to advance additional funds to a financially troubled borrower unless the borrower reduced its overhead expenses. *Id.* at 390. As a result, the borrower reduced the salary of an employee, who then in turn sued the lender for tortious interference of contract. *Id. Nitzberg* held that the lender's conduct was privileged, and that a party may act as "necessary to protect [its] own contractual rights, *provided that such interference is without malice." Id.* at 391 (emphasis added). Again, the lender's refusal was justified as a way of securing rights no greater than what it had already contracted for. In contrast, KCK allegedly used its leverage to induce Jenkins to break its promise to MCM.

Lastly, in *Farber v. New Haven Savings Bank*, the defendant did not refuse to make advances. 2000 WL 1475542, at *7 (Conn. Super. Ct. Sept. 21, 2000). Rather, he simply insisted on exercising a purported right of first refusal on the sale of certain real estate. *Id.* Nothing in that holding supports MCM's argument here. All in all, MCM adequately alleged that KCK used its leverage, without justification, to induce Jenkins to breach its contract with MCM.

33

*Breach of Contract.* KCK also argues that MCM fails to adequately allege that Jenkins breached the contract with MCM. Specifically, KCK believes that the Jenkins Contract is clear in allowing Jenkins to enter into the Non-Ferrous and Ferrous Contracts. Mot. Dismiss Counterclaims at 10-11. But here, the shoe is on the other foot from the motion to dismiss KCK's complaint—now, the Court must read the allegations in the light most favorable to MCM, and MCM is entitled to reasonable inferences. Several allegations set forth that Jenkins breached the contract by going too far in pledging the scrap to KCK:

- KCK induced Jenkins to enter into contracts for exclusive rights to scrap metal despite knowing that Jenkins did not have the contractual right to sell all of MCM's scrap. Counterclaims ¶ 4.

- Jenkins has no ownership rights to scrap. *Id.* ¶ 24.

- The addendum to the Jenkins Contract expressly provided that the scrap remained the property of MCM. Counterclaims *Id.* ¶ 29.

- MCM never assigned title to scrap. *Id.*

- Jenkins was only permitted to assist MCM with scrap sales, all of which were for the benefit of MCM. *Id.* ¶ 30.

- The Sickmiller Email did not grant any greater rights to scrap or the sale of scrap than those provided in the addendum. *Id.* ¶ 32.

These allegations, and the flip-side interpretation of the Sickmiller Email, adequately allege that Jenkins breached its contract with MCM when pledging to sell *all* scrap metal to KCK. The tortious-interference claim survives against MCM.

On the individual defendants, the tortious-interference claim also survives against Elam and the Ulms. Again, the Counterclaims allege that all three of them became aware of the Jenkins Contracts, were aware of Jenkins' financial struggles,

34

and wrongfully induced Jenkins to breach its contract with MCM. Counterclaims
¶¶ 37-39; 56-57.

### 2. Fraud (Count 2)

KCK moves to dismiss MCM's fraud claim, arguing that (1) MCM fails to plead
fraud with particularity; (2) MCM fails to allege reliance; and (3) MCM's assertion
that KCK "undervalued" scrap is not fraud, but rather an argument for reducing
damages. On the first two arguments, the allegations are set forth with adequate
particularity, including on reliance. MCM alleges two separate misrepresentations
made by KCK. First, MCM alleges that KCK produced documents in discovery
showing that KCK under-reported the amount of scrap metal removed from the
Crawford Plant. Counterclaims ¶ 44. The documents provide the requisite Rule 9(b)
detail of when the representations were made, and each representation's content. The
documents purportedly show (when read in MCM's favor) that Elam and the Ulms
directed KCK and Polymer to fraudulently obtain scrap without paying for it. *Id.* ¶ 43.
The records contain allegedly false statements comprising the underreporting of 24
loads of metal (17 ferrous loads and 7 non-ferrous loads), estimated at $61,952.52 and
$136,159.25. *Id.* ¶ 44. Because MCM describes these documents, the context in which
they were received, as well as their contents, it sufficiently pled the who, what, when,
where, how of the fraud *See Pirelli*, 631 F.3d. at 441-42. And MCM relied on the
representations by accepting that the quantities of scrap were accurate.
Counterclaims ¶¶ 63-64

MCM also alleges that it learned in discovery that KCK, through the direction of Elam and the Ulms, grossly under-represented the *value* of the scrap (as distinct from the quantity of the scrap) taken from the Crawford Plant. Counterclaims ¶ 45. A knowingly false statement as to the value of the scrap would be fraud, not just a basis to reduce damages, as KCK argues. But it is true that this allegation is light on details, like which scrap loads at issue, what is the estimated extent of the shortage, and so on. And MCM does not otherwise attach specific records on this aspect of the claim. Having said that, the Court is reluctant to slice and dice the fraud claim so thinly that even this sliver of it should be dismissed. So this aspect of the claim may remain in the case for now; at summary judgment, however, MCM must come forward with actual evidence of this claim.

On the individual defendants, again the fraud claim says enough about the role of Elam and the Ulms. The records produced in discovery, viewed in MCM's favor, show that all three individuals directed KCK to fraudulently obtain scrap without paying for it. Counterclaims ¶ 43. And, for now, the Court must accept as true the allegation that all three were aware that those documents contained false information intended to induce MCM to accept less than what the scrap was valued for. *Id.* ¶ 63. Whether discovery bears that out or not remains to be seen, but the fraud claim survives against them.

### 3. Conversion (Count 3)

MCM moves to dismiss the conversion counterclaim, arguing that KCK failed to plead a pre-suit demand for possession. *See* Mot. Dismiss Counterclaims at 12. But

MCM did demand possession—before filing the conversion counterclaim—in its supplemental response in opposition to KCK's motion for a temporary restraining order. Counterclaims ¶ 69. Against this, KCK contends that MCM was required to make the demand *before* the filing of the lawsuit, citing *Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 741 (7th Cir. 2016); Mot. Dismiss Counterclaims at 12. It is true that *Stevens* affirmed the principle that a lawsuit itself typically cannot provide the pre-suit notice required for a conversion claim. *Stevens*, 830 F.3d at 741. But here it was *KCK* that filed the lawsuit. *Stevens* says nothing about a situation, like this, in which the *defendant* in an already-filed lawsuit now is presented with the possibility of bringing *counter*claims. Counterclaims ¶¶ 43-45; R. 96, Counter-Pl.'s Resp. Br. at 11. Indeed, the primary purpose of the demand requirement is to avoid unnecessary litigation. *See Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861. F.2d 1054, 1060 (7th Circ. 1988). But MCM was already a litigant. What's more, MCM provided notice of the alleged conversion in its supplemental TRO response—before filing the counterclaim. Counter-Pl.'s Resp. Br. at 12. So MCM has adequately pled the demand requirement against KCK.

Beyond KCK, however, the conversion counterclaim does not sufficiently allege the role of the other named defendants, that is, Elam, the Ulms, and Polymer.[8] (Nor is it clear that the pre-claim demand requirement was satisfied as to those individual defendants, nor as to Polymer, because those individuals and Polymer were not the recipient of the supplemental TRO response.) So the conversion counterclaim is

---

[8]Count 3 is the only counterclaim brought against Polymer. *See* Counterclaims ¶¶ 65-69.

dismissed without prejudice as to those defendants. MCM may amend only the conversion counterclaim and only as to those defendants by September 16, 2020. But the Court urges MCM to consider whether it is truly necessary to name those defendants given the other counterclaims.

### 4. Tortious Interference (Count 4)

Lastly, KCK moves to dismiss the tortious-interference claim, arguing that (1) KCK's alleged interference was privileged and in service of its own legitimate interests; (2) MCM fails to adequately identify the actual third-party against whom the alleged interference was directed; and (3) MCM fails to allege damages. Mot. Dismiss Counterclaims at 13-14.

None of these arguments have merit. Again, to successfully state a claim of interference with business expectancy, a plaintiff must allege (1) a "reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 731 (7th Cir. 1999). An alleged instance of interference may be privileged—that is, no liability attaches—when (1) it protects a conflicting interest that is, under the law, of equal or greater value than the plaintiff's contractual rights; and (2) it is legal and otherwise not unreasonable under the circumstances. *Connaughton v. Gertz,* 418 N.E.2d 858, 861 (Ill. App. Ct. 1981). Generally speaking, in federal court, the defendant must raise

this type of privilege as an affirmative defense, though in some cases a complaint so clearly reveals the existence of the defense that judgment on the pleadings is warranted. *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.,* 192 F.3d 724, 731 (7th Cir. 1999). Where the complaint itself establishes the existence of a privilege, it is the plaintiff's burden to plead (and ultimately to prove) that the defendant's conduct was unjustified or malicious.[9] *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 545 N.E.2d 672, 677 (Ill. 1989); *Serv. By Air, Inc. v. Phoenix Cartage & Air Freight, LLC*, 78 F. Supp. 3d 852, 864 n.4 (N.D. Ill. 2015) (citing Illinois case law).

First, KCK contends that the Counterclaims themselves establish KCK's privilege to interfere, so MCM was required in its pleadings to allege KCK's lack of justification. Mot. Dismiss Counterclaims at 13. But the Counterclaims do not reflect a privilege to interfere. KCK relies on *Rehabcare Grp. E., Inc. v. CC Care, LLC*, 2016 WL 2595108 (N.D. Ill. May 4, 2016), to contend that MCM, in essence, pled itself out of court because the Counterclaims themselves establish the privilege. But *Rehabcare* differs from this case in important ways. There, the plaintiff alleged tortious interference against a hospital-management company. *Id.* at *1. Under Illinois law, hospital-management companies enjoy a privilege from tortious-interference claims. *Id.* at *3 n.2. The source of the privilege (that is, the defendant's status as a hospital-management company) was undisputedly alleged on the face of the complaint, so the privilege's application was plain in the pleading. *Id.*

---

[9]The same privilege—and pleading requirements for overcoming the privilege—apply to both interference with contract and interference with business expectancy. *Serv. By Air*, 78 F. Supp. at 865 (N.D. Ill. 2015) (citing Illinois case law).

That does not apply here. The source of KCK's purported privilege is disputed on the face of MCM's pleading. MCM alleges, for example, that, "[Jenkins] has no ownership rights to scrap," Counterclaims ¶ 24, "[t]he Addendum expressly provided that scrap remained the property of MCM," *id.* ¶ 29, and "MCM did not approve these contracts or otherwise grant [Jenkins] or anyone else the right to sell all the scrap," *id.* ¶ 36 (emphasis omitted). Those allegations do not establish KCK's privilege, so MCM was not required to plead lack of justification in the pleadings. *See Int'l Mktg.*, 192 F.3d at 731.

Second, MCM adequately pleads the identity of the third-parties. The Counterclaims allege that KCK sent cease-and-desist letters to several customers, including Sims Metal Management, a named Defendant in KCK's own complaint. Counterclaims ¶¶ 46-47, 50-51; First Am. Compl. ¶¶ 11, 86. Moreover, KCK is also aware that it sent cease-and-desist letters to Ferrous Processing and Trading Company, another named Defendant in KCK's own complaint. First Am. Compl. ¶¶ 12, 87. No doubt that MCM will eventually be required in discovery to specify the complete universe of third-parties, but at the pleading stage, MCM has done enough in identifying them.

Third, MCM adequately alleges that the cease-and-desist letters caused damages in the form of lost scrap sales to other purchasers. Counterclaims ¶¶ 52, 74. Nothing more is needed to allege damages at this stage of the case.

Lastly, as to the individual defendants (Elam and the Ulms), again MCM adequately alleges that all three individuals were involved in sending cease-and-

desist letters to MCM's customers. *See* Counterclaims ¶¶ 46-47, 50, 52, 72. So the tortious-interference claim survives against the individuals too.

## IV. Conclusion

The defense's motion to dismiss the First Amended Complaint is denied. KCK's motion to dismiss the Counterclaims is denied in large part, and granted in limited part. The conversion counterclaim (Count 3) is dismissed without prejudice as to Chad Elam, Keith Ulm, Kenneth Ulm, and Polymer. As noted above, if MCM really thinks it appropriate, then MCM may file First Amended Counterclaims (limited to amending the conversion counterclaim as to those particular defendants) by September 16, 2020.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 1, 2020